**In re TWINTON PROPERTIES PARTNERSHIP, Debtor.**

**TWINTON PROPERTIES PARTNERSHIP, Plaintiff,**

**v.**

**Frank G. NIDIFFER and W.W. Thomas, Defendants.**

**Bankruptcy No. 281–02721. Adv. No. 283–0600.**

United States Bankruptcy Court, M.D. Tennessee.

Oct. 29, 1984.

See also, D.C., 33 B.R. 111.

John Camp, Sparta, Tenn., Russell Hippe, Jr., Trabue, Sturdivant & DeWitt, Nashville, Tenn., for Williams-Farms.

John G. Doak, Harold Childers, Nashville, Tenn., for defendants.

James C. Hofstetter, Hofstetter & Hofstetter, Nashville, Tenn., for Appalachian Oil & Gas Co., Inc.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

At issue is the title to and ownership of approximately 2,678 acres of land in Overton County, Tennessee.[1] After consideration of the proof, briefs and arguments of the parties, the court determines that valid title is held by the debtor-in-possession.

The following constitute findings of fact and conclusions of law as required by Rule 7052 of the Bankruptcy Rules.

On August 27, 1981, Twinton Properties Partnership ("Twinton") filed a voluntary Chapter 11 petition. Frank G. Nidiffer ("Nidiffer") thereafter filed a proof of claim which on its face is a claim to ownership of an "unspecified, unliquidated" amount of land scheduled as an asset by Twinton.[2] W.W. Thomas ("Thomas") also claims title to some of the same land through Nidiffer.[3] Twinton objected to the claims on July 29, 1983 and a pretrial conference was held on September 30, 1983. A trial was conducted February 13, 1984 and thereafter reems of documentary evidence and supplemental exhibits have been submitted and considered.[4]

Procedurally this proceeding has been complicated by the fact that it was originally commenced with the filing of a proof of

---

**1.** The exact amount of acreage involved is uncertain. The total amount proven through the conveyances to Twinton is between 2678 and 2878. One tract differs in description regarding 300 or 500 acres and accounts for the inconsistency.

**2.** The disputed property is part of a series of land grants issued to one John McCormick by the State of Tennessee in 1836. The land originally transferred constituted more than 200,000 acres. The disputed acreage lies within Overton County, Tennessee and is part of grant Nos. 6672 and 6932, each originally totalling 5,000 acres. Parts of land grants 6672 and 6932 lie in Fentress County, but that acreage is not at issue in this proceeding.

**3.** All references to Nidiffer also apply to Thomas. Although Thomas is a separate party defendant, it is stipulated that his claim is purely derivative from Nidiffer and for the sake of simplicity, all references to the proof will be to Nidiffer.

**4.** This proceeding was largely complicated by the fact that Nidiffer and Thomas repeatedly failed to comply with the court's pretrial orders and procedures. Although Nidiffer's original attorney was compelled to withdraw from the case because of ill health, substitute counsel was procured more than two and one-half months before trial. Nonetheless, Nidiffer never filed an answer, failed to respond to pretrial discovery, and consented to a deposition only after a Motion to Compel was granted by the court. Much of the proof presented by Nidiffer was unreadable and incomprehensible in the disconnected form in which it was offered.

claim by Nidiffer and an objection to that claim by the debtor. Apparently, Nidiffer sought to avail himself of the evidentiary advantage afforded by Bankruptcy Rule 3001(f): "A proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim." The term "claim" is defined in 11 U.S.C.A. § 101(4) (West 1979) as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

In this case, Nidiffer is not asserting a right to payment or claiming breach of performance, but contends that he is the rightful owner of property scheduled by Twinton as an asset. Bankruptcy Rule 7001(2) provides for an adversary proceeding "to determine the validity, priority or extent of a lien or other interest in property" and Bankruptcy Rule 7001(9) provides for an adversary proceeding "to obtain a declaratory judgment relating to any of the foregoing." A party claiming to *own* property held by a debtor in a bankruptcy case should file a complaint to recover that property and that complaint should be treated under the rules provided in Part VII of the Bankruptcy Rules.

It is, of course, true that an entity claiming an "interest" in the debtor—for example, a shareholder or owner of a partnership interest—can appropriately file a proof of its interest in the bankruptcy case.[5] The concept of "interest" is not defined by the Bankruptcy Code. The legislative history

indicates that a proof of interest includes "the interest of a general or limited partner in a partnership, the interest of a proprietor in a sole proprietorship, or the interest of a common or preferred stockholder in a corporation." 124 CONG.REC. H11093 (daily ed. Sept. 28, 1978) (comments of Congressman Edwards). It does not appear to this court that all who claim rights in a debtor's *property*, as opposed to claiming rights of ownership in the debtor itself, should be classified as "interest" holders for purposes of filing proofs. Other sections of the Code which address the rights of interest holders do not seem to contemplate that one claiming to be the owner of property also claimed by the debtor should assert that ownership interest by way of a proof in the bankruptcy case.[6] In fact, to do so confuses the procedural posture within the bankruptcy case of those who claim to own property also claimed by the debtor—exactly what happened in this case.

The pretrial order entered November 3, 1983 recites that this matter is to be treated as an adversary proceeding pursuant to Bankruptcy Rule 3007. This was appropriate because it appeared at the conference that the debtor's objection to Nidiffer's claim involved determining title to and interests in property. The issue stated for trial was "Does Mr. Nidiffer have title to the 3,000 acres in Overton County, Tennessee?" As will be demonstrated below, no matter how one constructs the causes of action, the labels of the parties or the burdens of proof in this case, the debtor-in-possession is not dispossessed of its title to the disputed property.

## I. CLAIMS DISPUTE

 Treating this controversy as a traditional claims dispute, Nidiffer failed to establish the validity of his claim. A properly filed proof of claim is *prima facie* evidence of the validity of the claim. Bank-

---

**5.** *See* 11 U.S.C.A. § 501(a) (West 1979). It is not clear that one filing a "proof of *interest*" is entitled to any evidentiary presumption under Bankruptcy Rule 3001(f) given that the presumption applies to a "proof of *claim*."

**6.** *See, e.g.,* 11 U.S.C.A. § 1124 (West 1979).

ruptcy Rule 3001(f). The ultimate burden of persuasion, however, always is vested in the claimant. If the objecting party rebuts the *prima facie* validity of the proof of claim, the claimant bears the burden of persuasion to prove the validity of the claim by a preponderance of the evidence. *See, e.g., Central Rubber Products, Inc. v. Stafford Higgins Industries, Inc.*, 31 B.R. 865, 867 (Bankr.D.Conn.1983); *United States v. Coleman American Companies, Inc.*, 26 B.R. 825, 10 BANKR.CT.DEC. (CRR) 185 (Bankr.D.Kan.1983).

At trial, the court held that Twinton carried its burden of rebutting the *prima facie* validity of the proof of claim. [Tr. p. 77]. Nidiffer, then failed to demonstrate legal title by a preponderance of the evidence.

Nidiffer argued two alternate theories. Nidiffer proffered an array of grants, deeds, wills, and other conveyances to assert alternative chains of title back to land grants issued in 1836. The proposed chains of title are replete with gaps and inadequacies. First, Nidiffer proved that John McCormick, the initial grantee of the subject property from the State of Tennessee, conveyed his interest to Tennessee and New York Mining and Manufacturing Company. [Exh. C]. The acknowledgement on the conveyance, however, does not comport with the Tennessee law on acknowledgements and is, therefore, defective.[7] The conveyance also allowed McCormick to convey up to 5,000 acres of the property to persons settling on the property. No proof was offered that such conveyances were or were not made and it is impossible to determine from the proof if the original 5,000 acre tracts remained intact. The property was subsequently mortgaged and a foreclosure resulted. [Exhs. E, F·and Z]. After the foreclosure, the property was conveyed to Charles Manning. [Exh. Y]. The deed evidencing the conveyance contains a defective acknowledgement. The property was then willed to Alice W. Litton ("Litton"), but no proof was tendered that Litton was Manning's sole surviving heir and, therefore, acquired fee title to the property. Nidiffer offered a certified copy of a quitclaim deed from Litton to American Timber and Coal Company ("American Timber"), an Ohio corporation, dated May 20, 1911 and recorded January 17, 1912. The document, however, was recorded in Fentress and White Counties and not in Overton County where the subject property is located. [Exh. K].[8] Twinton also argued that Litton held no interest in the property at the time of the conveyance because of a warranty deed issued by the Tennessee Supreme Court indicating title was deeded to a third party as the result of a judgment against Litton.

As a second route to prove title to American Timber, Nidiffer tendered McCormick's will that conveyed all his property to Mary Shriver ("Shriver"). McCormick may not have owned any property in Overton County to convey to Shriver, because the tax

---

7. Tennessee law is very particular about the language that is necessary to constitute a valid notary acknowledgement. TENN.CODE ANN. § 66–22–107 explicitly provides that the probating officer *shall* use the form of certificate of acknowledgement set forth in the statute. Tennessee law is well-settled that the omission of the words "personally acquainted with the grantor," or similar words, constitutes a fatal defect in the acknowledgement and causes the deed to be null and void as to creditors and bona fide purchasers without notice. TENN. CODE ANN. § 66–26–103. *See McAllester v. Aldridge (In re Anderson)*, 30 B.R. 995, 1003–1004 (M.D.Tenn.1983) and the cases catalogued therein. The Tennessee Supreme Court has specifically held that the term "personally appeared before" does not connote that the probating officer was "personally acquainted with" the

grantor and, therefore, is an inadequate substitute. *See, e.g., Newton Finance Corp. v. Conner,* 161 Tenn. 441, 33 S.W.2d 95, 96–97 (1930). The requirement that the certificate state personal acquaintance has been a part of Tennessee law at all times relevant to this case. *See Peacock v. Thompkins,* 20 Tenn. 135 (1839); *Kelly v. Calhoun,* 5 Otto 710, 95 U.S. 710, 24 L.Ed. 544 (1878).

8. This conveyance included 46 separate tracts of land. Tennessee law requires that conveyances of real property involving several tracts of land, lying in different counties, shall be registered in each of the counties where any of such tracts lie. TENN.CODE ANN. § 66–24–103. *Cole v. Warner,* 93 Tenn. 155, 23 S.W. 110 (1893).

roles from Overton County for 1895, the year of McCormick's death, reveal no property ownership. Furthermore, McCormick was free to convey some of the 5,000 acres reserved in his original conveyance to Tennessee and New York Mining to other parties. Nidiffer offered a certified copy of a quitclaim deed to all 200,000 acres in consideration of one dollar from Shriver to George Black dated December 14, 1909 and recorded March 11, 1910. This deed also contains a defective notary acknowledgement that only states Shriver "personally came" and not that the notary was "personally acquainted" with her. [Exh. L]. Nidiffer then offered a deed transferring land grants 6672 and 6932 (as well as 19 other land grants) for one dollar from George Black to American Timber on December 20, 1910. [Exh. M].

Nidiffer also proposed two theories of how the property devolved from American Timber to himself. First, Nidiffer submitted the quitclaim deed dated July 31, 1976 and recorded July 26, 1979 from Anderson C. Bouchelle to "Frank Niedefer." [Exh. R].[9] The record, however, is devoid of an explanation as to how Bouchelle obtained title to the property from American Timber or what interest he had authority to convey. As an alternative theory, Nidiffer argued that American Timber executed for the consideration of one dollar a deed dated July 29, 1946 and recorded August 12, 1946 to Walter B. Carey that conveyed grants including 6672 and 6932. [Exh. N]. The corporation at that time, however, was out of existence and without authority to make such a conveyance.[10] Nidiffer submitted an unrecorded quitclaim deed dated December 15, 1983 (more than two years after the filing of this bankruptcy) which is a conveyance from Paul C. Dant and his wife, Betty Carey Dant, to Nidiffer. [Exh. O]. The deed purports to devise all interests of Betty Carey, the sole surviving heir of Walter B. Carey, the reputed recipient of the property from American Timber. The quitclaim deed purports to convey the property "conveyed by Jirah D. Buck, president of American Timber & Coal Co. to Walter B. Carey" although the deed to Walter Carey and the original Articles of Incorporation identify the president of American Timber as "Edgar C. Buck." Twinton challenged whether Betty Carey is the sole surviving heir of Walter Carey, but no proof was submitted on this issue.

■ In summary, the chains of title offered by Nidiffer are a gap-filled patchwork of sometimes unconnected conveyances which cannot withstand minimal scrutiny by this court.

## II. ADVERSARY PROCEEDING

If the court properly recharacterizes this lawsuit as an adversary proceeding by Ni-

---

**9.** Should this court assume that "Niedefer" and "Nidiffer" are the same? Twinton challenged the conveyance on the basis that they were not. No proof was offered by Nidiffer to explain the discrepancy.

**10.** American Timber was chartered December 16, 1910 for the purpose of mineral exploration and development for a finite existence not to exceed 25 years. The Articles of Incorporation of American Timber were cancelled March 21, 1921 for the nonpayment of franchise taxes. [Exh. U]. Nidiffer requests the court to take judicial notice of an Ohio statute that allows dissolved corporations to wind up their affairs. OHIO REV.CODE ANN. § 1701.88. Although the statute was not tendered as an exhibit, the court will recognize the laws of another state that may have applicability to this proceeding. The statute, however, does not mend the break in Nidiffer's chain of title as he suggests. First,

the statute became effective October 11, 1955 more than nine years after the conveyance was made. The statute does not provide for retroactive validation of conveyances made by corporations with no residual legal authority. Second, the statute allows a reasonable time to wind up the affairs of a defunct corporation and imposes a fiduciary responsibility on the officers and directors to do so as expeditiously as possible. It is unreasonable that a conveyance made more than 25 years after a corporation ceased to legally exist should be validated by a statute that has the limited purpose of filling the void created by the corporate dissolution. Such actions are not reasonably attendant to "winding up" the affairs of the corporation. Nidiffer's interpretation of the Ohio law would sanction "hidden" authority to dispose of corporate assets for unknowable periods of time after dissolution of a corporation. This cannot have been the intent of the Ohio legislature.

differ seeking a declaration of the title to the disputed property or seeking recovery of the same, Nidiffer has failed to carry his burden of proof.

■ State law dictates the standards for determining title and ownership to property. *See Butner v. United States*, 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979). The intervening bankruptcy case cannot be used as a shield to circumvent the state law rules of property recovery. Twinton is in possession of the property under colorable title of law. In order to recover the property from Twinton, Nidiffer would have to have instituted some action in state court.

■ Any action brought by Nidiffer would be barred by Tennessee law. None of the persons through whom his chain of title was asserted paid any property taxes on the property for the last 20 years, if at all. The proof is that from 1946 through 1978, property taxes were paid on the property by the persons through whom Twinton claims title. [Tr. p. 48]. When taxes are not paid by parties claiming title or their predecessors for 20 years or more, *all* actions to assert title to that property are barred under Tennessee law. TENN. CODE ANN. § 28–2–110 provides that:

(a) Any person having any claim to real estate or land of any kind, or to any legal or equitable interest therein, the same having been subject to assessment for state and county taxes, who and those through whom he claims have failed to have the same assessed and to pay any state and county taxes thereon for a period of more than twenty (20) years, shall be forever barred from bringing any action in law or in equity to recover the same, or to recover any rents or profits therefrom in any of the courts of this state.

*See also Burress v. Woodward*, 665 S.W.2d 707 (Tenn.1984); *Layne v. Baggenstoss*, 640 S.W.2d 1, 3 (Tenn.App.1982). Nidiffer would, therefore, be unable to prosecute any action under state law.[11]

■ If Nidiffer were allowed to prosecute an ejectment action,[12] he would be unable to carry the necessary burden of proof. An action for ejectment is a legal remedy that considers the actual legal title. *Langford v. Love*, 35 Tenn. 308, 3 Sneed 308 (Tenn.1855). To sustain an action for ejectment, Nidiffer would have to prove *perfect* legal title either by deraignment from state land grants, title from a common grantee, or by evidence of adverse possession for more than seven years. *Stockley v. Cissna*, 119 Fed. 812 (6th Cir. 1902); *Raines v. Pile*, 182 Tenn. 283, 185 S.W.2d 628 (1945); *Winters v. Hainer*, 107 Tenn. 337, 64 S.W. 44 (1901); *Lowry v. Whitehead*, 103 Tenn. 396, 53 S.W. 731 (1899). As noted *supra*, Nidiffer's chain of title is so fraught with defects that it is this court's opinion that no state court would consider it sufficient to sustain an action for ejectment or to sanction title in any other proceeding.

■ Even if under some theory unknown to this court, Twinton were assigned the burden of proof and compelled to demonstrate title to the property, sufficient evidence has been tendered to support Twinton's title. A person paying property taxes on the disputed property for the 20 years preceding the commencement of an action is entitled to a presumption of title.

---

**11.** The argument that Nidiffer is not barred by the tax statute because he is the "defendant" in this proceeding is spurious. As noted *supra*, Nidiffer is seeking judicial determination of the validity of his title and bears the requisite burden of proof. Nidiffer is the proponent of an action to recover property, not defending his title against an aggressor.

**12.** Although a plethora of actions to recover property are available under state law, the most appropriate remedy is an ejectment action. TENN.CODE ANN. § 29–15–102 provides that:

Any person having a valid subsisting legal interest in real property, and a right to immediate possession thereof, may recover the same by an action of ejectment.

An action for forcible entry and detainer or an action for trespass would be inappropriate because no ouster of possession was attempted. Similarly, other traditional common law actions are not appropriate.

TENN.CODE ANN. § 28–2–109 provides that:

> Any person holding any real estate or land of any kind, or any legal or equitable interest therein, who has paid, or who and those through whom he claims have paid, the state and county taxes on the same for more than twenty (20) years continuously prior to the date when any question arises in any of the courts of this state concerning the same, and who has had or who and those through whom he claims have had, his deed, conveyance, grant or other assurance of title recorded in the register's office of the county in which the land lies, for said period of more than twenty (20) years, shall be presumed prima facie to be the legal owner of said land.

The undisputed testimony is that Allred and Brown paid taxes on the property from 1946 through 1973. Taxes were also paid by successive owners through Twinton's acquisition in 1978. Twinton did become delinquent in its property tax payments, but taxes have been paid to redeem the property from a foreclosure sale. Nidiffer failed to rebut the statutory presumption of ownership and title.

Twinton has also proven a satisfactory chain of title to the land. This property devolved through a series of corporations and individuals and was divided and subdivided. Tennessee and New York Mining and Manufacturing Company which took title from John McCormick in 1839 is the apparent common grantee. [Tr. p. 50]. Part of the 200,000 acres originally vested in Tennessee and New York came to be owned by Briar Hill Collieries ("Briar Hill"). When Briar Hill became insolvent, its land was deeded to various individuals pursuant to decrees from the Chancery Court of Overton County. Twinton claims title to the subject property through these conveyances. Eighty-two acres from grant No. 6672 were conveyed by Clerk and Master's Deed to J. Glen Stone. [Exh. 24]. By special commissioner's conveyance dated July 15, 1943 and recorded March 18, 1944, 587 acres of grant No. 6932 was conveyed to Leslie Stringfield. [Exh. 23]. By a second special commissioner's conveyance dated July 30, 1942 and recorded May 8, 1943, 1,761 acres in grant No. 6672 were conveyed to J.A. Allred ("Allred") and W.B. Brown ("Brown"). [Exh. 22]. Stringfield subsequently conveyed his interest in property to Allred and Brown by deed dated July 15, 1943 and recorded March 18, 1944. [Exh. 21]. By Clerk and Master's Deed, 10 acres was conveyed to A.C. Owens on May 4, 1944. [Exh. 18]. These ten acres were conveyed from Owens to J. Glen Stone and C.W. Hoffman, [Exh. 17], and then conveyed from Stone and Hoffman to Allred and Brown. [Exh. 20]. Stone and Hoffman also conveyed 300 or 500 acres in grant No. 6932 to Allred and Brown. [Exh. 19]. In 1972, Allred and his wife conveyed their one-half interest in the entire property to their three daughters. [Exh. 14]. In 1973, Brown and his wife conveyed their one-half interest in the property to James E. Walker and his wife, Charlotte Walker, one of Allred's three daughters. [Exh. 13]. On August 17, 1973, Walker, his wife, and her two sisters, conveyed all the property acquired in exhibits 12, 13, and 14 to M.E. Ratliff and Company and Joe Schaeffer Motors, Inc. [Exh. 11]. Schaeffer Motors, Inc. subsequently conveyed its interest to Joe Schaeffer, Jr. [Exh. 10]. By warranty deed dated and recorded April 29, 1974, Ratliff and Schaeffer conveyed all interest in their property to F. Roger Page. [Exh. 9]. On July 31, 1974, Page conveyed the property to Pace Oil Company, Inc. ("Pace"). [Exh. 8]. On November 10, 1976, Pace sold the property to M.E. Ratliff for $450,000. [Exh. 7]. Ratliff and his wife quitclaimed their interest in the property to Ratliff Farms, Inc., [Exh. 6]. Ratliff Farms then quitclaimed a one-half interest to Williams Farms, Inc. [Exh. 5]. Finally, Ratliff Farms and Williams Farms quitclaimed their interests to Twinton in 1978. [Exh. 3 and 4]. No challenges to title, ownership, or transfer were advanced during any pertinent period.

■ Alternatively, Twinton holds legal title through adverse possession. TENN. CODE ANN. § 28–2–101 provides:

(a) Any person having had, by himself or those through whom he claims, seven (7) years' adverse possession of any lands, tenements, or hereditaments, granted by this state or the state of North Carolina, holding by conveyance, devise, grant, or other assurance of title, purporting to convey an estate in fee, without any claim by action at law or in equity commenced within that time and effectually prosecuted against him, is vested with a good and indefeasible title in fee to the land described in his assurance of title.

(b) No title shall be vested by virtue of such adverse possession, unless such conveyance, devise, grant, or other assurance of title shall have been recorded in the register's office for the county or counties in which the land lies during the full term of said seven (7) years' adverse possession.

Furthermore, TENN.CODE ANN. § 28–2–102 provides:

On the other hand, any person, and those claiming under him neglecting for the said term of seven (7) years to avail themselves of the benefit of any title, legal or equitable, by action at law or in equity, effectually prosecuted against the person in possession, under recorded assurance of title, as in § 28–2–101, are forever barred.

Throughout the 40 years preceding this action, no challenges were raised to the ownership or use of the property by Twinton or the persons through whom Twinton claims title. These persons have made more than a mere casual use of the land. The persons through whom Twinton claims title made active, substantial, and efficient use of the property. Although not every acre of land was fenced, cut, or otherwise impacted, substantial and consistent use of the property was made. They cut extensive amounts of timber, [Tr. p. 35], explored for oil, gas and coal, [Tr. p. 25], and painted boundaries, [Tr. p. 49]. They paid all applicable taxes. [Tr. p. 48]. The entirety of the land was surveyed and the land and minerals evaluated to assure max-imum utilization of the property's potential. Oil wells have been and are presently operating on the property, although other operations have been suspended pending resolution of this Chapter 11 case. The court finds that such uninterrupted extensive use of the property is sufficient under Tennessee law to evidence title in Twinton under a theory of adverse possession.

Accordingly, under any construction of this proceeding, the court finds that title to the 2,678 acres of land in Overton County, Tennessee is properly vested in Twinton Properties Partnership.

An appropriate order will be entered.